IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-26

 No. 127A20

 Filed 19 March 2021

 IN THE MATTER OF: H.A.J. and B.N.J.

 Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 14

 January 2020 by Judge Hal Harrison in District Court, Madison County. This matter

 was calendared for argument in the Supreme Court on 11 February 2021 but

 determined on the record and briefs without oral argument pursuant to Rule 30(f) of

 the North Carolina Rules of Appellate Procedure.

 Law Offices of Jamie A. Stokes, PLLC, by Jamie A. Stokes, for petitioner-
 appellee Madison County Department of Social Services.

 Michelle FormyDuval Lynch, for appellee Guardian ad Litem.

 Deputy Parent Defender Annick Lenoir-Peek for respondent-appellant mother.

 EARLS, Justice.

¶1 Respondent, the mother of the juveniles H.A.J. and B.N.J. (“Holden” and

 “Bella”)1, appeals from the trial court’s orders eliminating reunification as a

 permanent plan and terminating her parental rights. After careful review, we affirm

 the trial court’s orders.

 I. Background

 1 Pseudonyms are used in this opinion to protect the juveniles’ identity and for ease of

 reading.
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

¶2 On 14 August 2018, the Haywood County Department of Social Services (DSS)

 received a report alleging that Holden and Bella were being left alone while

 respondent-mother visited Mr. Scott2, with whom she was in a relationship. The

 report further alleged that Mr. Scott, who was in the hospital receiving treatment for

 abscesses due to intravenous drug use, had “gotten [respondent-mother] ‘hooked’ on

 Methamphetamine.” Haywood County DSS contacted Madison County DSS seeking

 assistance, and Madison County DSS contacted the Madison County Sheriff’s Office

 for assistance in locating Holden and Bella.

¶3 On or around 6 September 2018, the Madison County Sheriff’s Office located

 Holden and Bella in Hot Springs, North Carolina, and notified Madison County DSS.

 Madison County DSS interviewed Holden and Bella, and the juveniles revealed they

 had been hiding and fleeing from law enforcement and DSS for multiple days to avoid

 being removed from respondent-mother’s care. Holden and Bella disclosed that they

 had witnessed respondent-mother and Mr. Scott “shooting drugs with needles in their

 bodies.” The juveniles also stated they had witnessed Mr. Scott “striking the

 respondent mother, slinging her on the bed[,] and the respondent mother screaming

 for [Holden and Bella] to call 911.” Respondent-mother admitted to intravenous drug

 use and domestic violence between herself and Mr. Scott, including one occasion

 where Mr. Scott attempted to choke her in bed. Accordingly, on 7 September 2018,

 2 Also a pseudonym, used in this opinion to preserve confidentiality.
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 Madison County DSS filed petitions alleging that Holden and Bella were neglected

 and dependent juveniles and obtained nonsecure custody.

¶4 Following a hearing held on 15 October 2018, the trial court entered an order

 on 7 November 2018 adjudicating Holden and Bella neglected juveniles. The trial

 court entered an interim disposition order in which it placed the juveniles in the legal

 and physical custody of Madison County DSS and granted respondent-mother weekly

 supervised visitation. On 26 November 2018, the trial court entered a disposition

 order in which it set the permanent plan for the juveniles as reunification with a

 concurrent plan of guardianship. The trial court ordered respondent-mother to

 comply with the requirements of her DSS case plan, which included: (1) completing

 the Children in the Middle Parenting Course and Seeking Safety classes; (2) having

 no contact with Mr. Scott; (3) attending a substance abuse intensive outpatient

 treatment program (SAIOP); (4) a medical evaluation; and (5) random drug screens.

¶5 The trial court held a review hearing on 21 February 2019. In an order entered

 on 21 March 2019, the trial court found that respondent-mother: (1) had resolved

 pending criminal charges by pleading guilty to breaking and entering, and was placed

 on probation; (2) had a positive screen for alcohol; (3) had participated in a domestic

 violence class but had not received an assessment; (4) had completed the Children in

 the Middle Parenting Course but not the Seeking Safety class; and (5) needed to

 complete SAIOP and submit to random drug and alcohol screening. The trial court
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 also found that Holden and Bella were doing well in their foster care placements but

 had some behavioral issues.

¶6 A permanency planning review hearing was held on 4 April 2019. The trial

 court found as fact that: (1) respondent-mother had not yet secured housing; (2) she

 had completed SAIOP and intermediate treatment was recommended; (3) despite

 treatment, respondent-mother continued to have issues with alcohol consumption; (4)

 respondent-mother had not yet completed the Seeking Safety class; and (5)

 respondent-mother had not yet received a domestic violence assessment. The trial

 court further found as fact that Bella was experiencing behavioral issues that were

 the result of prior trauma. Consequently, the trial court directed that respondent-

 mother’s visitation with Bella “occur as therapeutically recommended.”

¶7 The trial court held another permanency planning review hearing on 16 May

 2019. On the day of the hearing, the attorney for DSS requested a change in the

 permanent plan for Holden and Bella to adoption with a concurrent plan of

 guardianship, and the attorney for the guardian ad litem concurred. Respondent-

 mother objected to the requested change, citing a lack of notice and due process

 concerns because DSS and the guardian ad litem had recently filed reports in which

 they had not recommended such a change. The trial court directed DSS to proceed.

¶8 The trial court entered an order from the hearing on 8 August 2019. In the

 permanency planning review order, the trial court found that since the last hearing
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 respondent-mother: (1) had not yet secured or maintained independent housing, had

 been kicked out of her prior residence, and was residing with her parents; (2) had

 missed scheduled visitations in April 2019 and on Mother’s Day 2019; (3) was

 continuing to use alcohol in violation of a prior court order and had received a recent

 DWI charge which remained pending; (4) was currently on probation for breaking

 and entering; (5) did not have stable transportation; (6) had completed over ninety

 hours of SAIOP but had not participated in an aftercare program as recommended;

 (7) was substituting alcohol for methamphetamine use; (8) had not obtained a

 domestic violence assessment; and (9) had not started the Seeking Safety course. The

 trial court further found that the juveniles remained in licensed foster care and were

 doing well in their placement and in school. The trial court determined that the

 return of the juveniles to their home within six months was not likely and that further

 efforts at achieving reunification would be futile or inconsistent with the juveniles’

 need for a safe, permanent home within a reasonable period. Accordingly, the trial

 court relieved DSS of further reunification efforts and changed the permanent plan

 for the juveniles to adoption with a concurrent plan of guardianship. Respondent-

 mother filed notice to preserve her right to appeal.

¶9 On 28 June 2019, DSS filed petitions to terminate respondent’s parental

 rights. On 14 January 2020, the trial court entered an order in which it determined

 that grounds existed to terminate respondent’s parental rights to both juveniles due
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 to neglect. N.C.G.S. § 7B-1111(a)(1) (2019). The trial court further concluded it was

 in Holden’s and Bella’s best interests that respondent’s parental rights be

 terminated. Accordingly, the trial court terminated respondent’s parental rights.3

 Respondent-mother appeals.

 II. Permanency Planning Review Order

¶ 10 Respondent-mother first argues the trial court erred by denying her motion to

 continue the 16 May 2019 permanency planning review hearing. Respondent-mother

 contends that she relied on the representations made by DSS and the guardian ad

 litem in their written reports and was not provided sufficient notice that they would

 be requesting a change in the juveniles’ permanent plan at the hearing. Respondent-

 mother argues that had she been aware that their recommendations would be

 changing, she would have had an opportunity to present evidence as to why

 reunification efforts should continue. Therefore, respondent-mother argues the trial

 court violated her constitutional right to due process.

¶ 11 “Ordinarily, a motion to continue is addressed to the discretion of the trial

 court, and absent a gross abuse of that discretion, the trial court’s ruling is not subject

 to review.” In re A.L.S., 374 N.C. 515, 516–17 (2020) (quoting State v. Walls, 342 N.C.

 1, 24 (1995)). “However, if ‘a motion to continue is based on a constitutional right,

 3 The district court’s order also terminated the parental rights of the juveniles’ fathers,

 including unknown fathers, but the fathers did not appeal and are not a party to the
 proceedings before this Court.
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 then the motion presents a question of law which is fully reviewable on appeal.’ ” In

 re S.M., 375 N.C. 673, 679 (2020). “To establish that the trial court’s failure to give

 additional time to prepare constituted a constitutional violation, [the] [respondent-

 mother] must show ‘how [her] case would have been better prepared had the

 continuance been granted or that [s]he was materially prejudiced by the denial of

 h[er] motion.’ ” State v. McCullers, 341 N.C. 19, 31 (1995) (quoting State v. Covington,

 317 N.C. 127, 130 (1986)).

¶ 12 Here, the record demonstrates, and respondent-mother acknowledges in her

 brief, that the hearing was designated as a permanency planning hearing. Thus,

 respondent-mother was on notice that the trial court could change the permanent

 plan for the juveniles. See N.C.G.S. § 7B-906.2(a) (2019) (“At any permanency

 planning hearing pursuant to G.S. 7B-906.1, the court shall adopt one or more of the

 following permanent plans the court finds is in the juvenile’s best interests: (1)

 Reunification[;] (2) Adoption[;] (3) Guardianship[;] (4) Custody to a relative or other

 suitable person[;] (5) Another Planned Permanent Living Arrangement (APPLA)[; or]

 (6) Reinstatement of parental rights[.]”) (emphasis added). Although respondent-

 mother argues that DSS and the guardian ad litem should be required to give notice

 of a change in recommendations in advance of the permanency planning hearing,

 such notice is not required by Chapter 7B. Furthermore, even if respondent-mother

 had been notified of the change in recommendations, as the Court of Appeals has
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 observed, “North Carolina caselaw is replete with situations where the trial court

 declines to follow a DSS recommendation.” In re Rholetter, 162 N.C. App. 653, 664

 (2004).

¶ 13 We further note that after learning at the hearing that DSS and the guardian

 ad litem were seeking a change in the permanent plan for the juveniles, respondent-

 mother objected to the change in plan. While respondent-mother objected to the trial

 court changing the permanent plan for the juveniles at the hearing, the record does

 not reflect that counsel asked for the hearing to be continued. Even if we construe

 respondent-mother’s objection as a request for a continuance, there is no evidence in

 the transcript demonstrating how respondent-mother was materially prejudiced by

 denial of the motion. See In re A.L.S., 374 N.C. 515, 518 (2020) (concluding that

 respondent-mother failed to demonstrate prejudice where her “counsel offered only a

 vague description of the son’s expected testimony and did not tender an affidavit or

 other offer of proof to demonstrate its significance.”); see also In re D.Q.W., 167 N.C.

 App. 38, 41 (2004) (concluding there was no prejudice where respondent did not

 explain why his counsel had inadequate time to prepare for the hearing; what

 specifically his counsel hoped to accomplish during the continuance; or how

 preparation would have been more complete had the continuance motion been

 granted). Respondent-mother also fails to identify in her brief any evidence, defenses,

 or testimony she was unable to present. Given the nature of a permanency planning
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 hearing, as defined by statute, respondent was on notice that she needed to present

 all evidence relevant to her arguments concerning the proper disposition. Therefore,

 based upon the record before us, we conclude respondent-mother has failed to

 demonstrate prejudice. She has not demonstrated how her case would have been

 better prepared, or a different result obtained, had a continuance been granted. In

 these circumstances, the trial court did not err by proceeding with the hearing and

 respondent-mother’s due process rights were not violated.

¶ 14 We next consider respondent-mother’s arguments that the trial court erred by

 failing to make the factual findings required by N.C.G.S. § 7B-906.2 when eliminating

 reunification with respondent-mother from the juveniles’ permanent plan. This

 Court’s review of a permanency planning review order “is limited to whether there is

 competent evidence in the record to support the findings [of fact] and whether the

 findings support the conclusions of law.” In re L.M.T., 367 N.C. 165, 168 (2013)

 (quoting In re P.O., 207 N.C. App. 35, 41 (2010)). “The trial court’s findings of fact are

 conclusive on appeal if supported by any competent evidence.” Id. (citing In re P.O.,

 207 N.C. App. at 41). “At a permanency planning hearing, ‘[r]eunification shall be a

 primary or secondary plan unless,’ inter alia, ‘the court makes written findings that

 reunification efforts clearly would be unsuccessful or would be inconsistent with the

 juvenile’s health or safety.’ ” In re J.H., 373 N.C. 264, 267 (2020) (quoting N.C.G.S. §

 7B-906.2(b) (2019)). When making such a determination, the trial court must make
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 written findings “which shall demonstrate the degree of success or failure toward

 reunification,” including:

 (1) Whether the parent is making adequate progress
 within a reasonable period of time under the plan.

 (2) Whether the parent is actively participating in or
 cooperating with the plan, the department, and the
 guardian ad litem for the juvenile.

 (3) Whether the parent remains available to the court, the
 department, and the guardian ad litem for the juvenile.

 (4) Whether the parent is acting in a manner inconsistent
 with the health or safety of the juvenile.

 N.C.G.S. § 7B-906.2(d) (2019). While “use of the actual statutory language [is] the

 best practice, the statute does not demand a verbatim recitation of its language.” In

 re L.M.T., 367 N.C. at 167. Instead, “the order must make clear that the trial court

 considered the evidence in light of whether reunification would be futile or would be

 inconsistent with the juvenile’s health, safety, and need for a safe, permanent home

 within a reasonable period of time.” Id. at 167–68 (cleaned up).

¶ 15 Here, despite respondent-mother’s claims to the contrary, the trial court made

 written findings of fact in accordance with N.C.G.S. § 7B-906.2(d). The trial court

 found the following as fact:

 6. That the Court has received testimony from Bethany
 Wyatt (Madison County DSS); the respondent mother; and
 has considered the DSS Report; the GAL Report; and other
 documentation; that since these matters were last
 reviewed, the juveniles have remained placed in licensed
 foster care in Madison County; are doing well in placement
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

and school; referrals for therapy have been made; the
respondent mother has not secured or maintained
independent housing; currently resides with her parents;
testified she was kicked out of her prior residence in March,
2019; missed scheduled visitation on 04/05/19; missed
scheduled Mother’s Day visitation; continues to use alcohol
in violation of the prior Court Order; received a recent DWI
charge that remains pending (0.15 on breathalyzer); is
currently on probation for Breaking and Entering
conviction; does not have stable transportation; previously
completed over 90 hours of SAIOP at RHA but has not
participated in the aftercare program as recommended;
states that she has recently re-engaged in that therapy but
the Court finds the documentation she has provided on this
issue is not credible and the Court gives no weight to same;
is now substituting alcohol for methamphetamine use; has
not obtained a DV assessment (the respondent mother
testified she has had difficulty finding a provider for this
service although being ordered to do so since the
dispositional hearing); states she has completed DV
coursework; the Court does not find the same satisfies the
requirement of the DV assessment and treatment; has not
started the Seeking Safety course; has not completed the
TRACES peer support program; . . . that the barrier to
implementing the permanent plan remains [respondent-
mother’s] failure to complete [her] DSS case plan
requirements[.]

7. That this matter came on for permanency planning
hearing. . . [and] that the [c]ourt has considered all the
evidence, including the progress made and the current
barriers to implementing the designated permanent plan
of reunification.

....

9. That the return of the juveniles to the home of
[respondent-mother] immediately or within six months is
not likely; that reunification is no longer the appropriate
permanent plan for the juveniles[.]
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 ....

 11. That the following services have been provided by the
 Petitioner to prevent or eliminate the need for placement
 of the juveniles and to place the juveniles in a timely
 manner in accordance with the permanent plan:
 facilitation of visits for respondent mother; referral to RHA
 for respondent mother; [and] coordination with respondent
 mother and case planning activities[.]

 12. That reasonable efforts have been made by the
 Petitioner to prevent or eliminate the need for placement
 of the juveniles but the return of the juveniles to the home
 of the respondent parents is contrary to their welfare and
 best interests at this time.

 13. That further reasonable efforts [to] prevent or
 eliminate the need for placement of the juvenile[s] are no
 longer required as the same would be clearly futile or
 inconsistent with the juveniles’ need for a safe, permanent
 home within a reasonable period of time and are no longer
 required.

 Respondent-mother does not claim that these findings are unsupported by the

 evidence, and we are bound by them on appeal. See In re T.N.H., 372 N.C. 403, 407

 (2019) (stating that “[f]indings of fact not challenged by respondent are deemed

 supported by competent evidence and are binding on appeal.”). Based on these

 findings of fact, the trial court relieved DSS of further reunification efforts and

 removed reunification from the juveniles’ permanent plan.

¶ 16 The trial court’s findings of fact establish that it addressed each of the factors

 specified in N.C.G.S. § 906.2(d). Finding of fact number 6 sets forth numerous details

 demonstrating that respondent-mother had not been making adequate progress or
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

actively participating in her case plan and had been acting in a manner inconsistent

with the juveniles’ health or safety. The trial court found as fact that respondent-

mother had failed to maintain stable housing and transportation; had continued

using alcohol in violation of prior court orders and as a substitute for

methamphetamine use; had missed scheduled visitations; was recently charged with

DWI and was on probation for a breaking and entering conviction; and had failed to

provide documentation regarding her participation in substance abuse aftercare

treatment and domestic violence counseling. Cf. N.C.G.S. § 7B-906.2(d)(1), (4) (2019).

The trial court further found that the barrier to implementing the permanent plan of

reunification was respondent-mother’s failure to complete her case plan

requirements. Cf. N.C.G.S. § 7B-906.2(d)(2) (2019). The trial court’s additional

findings, including the trial court’s summation of respondent-mother’s testimony, and

its finding that DSS coordinated with respondent-mother when providing services

aimed at eliminating the need for placement, demonstrated that respondent-mother

remained available to the trial court and DSS. Cf. N.C.G.S. § 7B-906.2(d)(3) (2019).

While the trial court’s findings did not use the precise statutory language, the

findings did address the necessary statutory factors “by showing ‘that the trial court

considered the evidence in light of whether reunification would be futile or would be

inconsistent with the juvenile’s health, safety, and need for a safe, permanent home

within a reasonable period of time[.]’ ” In re L.E.W., 375 N.C. 124, 133 (2020) (quoting
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 In re L.M.T., 367 N.C. at 167–68). Therefore, we reject respondent-mother’s argument

 that the trial court failed to make sufficient findings of fact when eliminating

 reunification from the juveniles’ permanent plan, and we affirm the trial court’s

 permanency planning review order.

 III. Termination Order

¶ 17 Respondent-mother next contends that the trial court erred in concluding that

 grounds existed to terminate her parental rights. “Our Juvenile Code provides for a

 two-step process for termination of parental rights proceedings consisting of an

 adjudicatory stage and a dispositional stage.” In re Z.A.M., 374 N.C. 88, 94 (2020)

 (citing N.C.G.S. §§ 7B-1109, -1110 (2019)). “At the adjudicatory stage, the petitioner

 bears the burden of proving by ‘clear, cogent, and convincing evidence’ the existence

 of one or more grounds for termination under section 7B-1111(a) of the General

 Statutes.” In re A.U.D., 373 N.C. 3, 5–6 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)).

 We review a trial court’s adjudication of grounds to terminate parental rights “to

 determine whether the findings are supported by clear, cogent and convincing

 evidence and the findings support the conclusions of law.” In re E.H.P., 372 N.C. 388,

 392 (2019) (quoting In re Montgomery, 311 N.C. 101, 111 (1984)). “The trial court’s

 conclusions of law are reviewable de novo on appeal.” In re C.B.C., 373 N.C. 16, 19,

 (2019).

¶ 18 The sole ground found by the trial court to support termination of respondent-
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

mother’s parental rights was neglect. See N.C.G.S. § 7B-1111(a)(1). A trial court may

terminate parental rights pursuant to this statutory ground where it concludes the

parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. Id. A

neglected juvenile is defined, in pertinent part, as a juvenile “whose parent, guardian,

custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or

who lives in an environment injurious to the juvenile’s welfare . . . .” N.C.G.S. § 7B-

101(15) (2019). In some circumstances, the trial court may terminate a parent’s rights

based on neglect that is currently occurring at the time of the termination hearing.

See, e.g., In re K.C.T., 375 N.C. 592, 599–600 (2020) (“[T]his Court has recognized

that the neglect ground can support termination . . . if a parent is presently neglecting

their child by abandonment.”). However, in other instances, the fact that “a child has

not been in the custody of the parent for a significant period of time prior to the

termination hearing” would make “requiring the petitioner in such circumstances to

show that the child is currently neglected by the parent . . . impossible.” In re N.D.A.,

373 N.C. 71, 80 (2019). In this situation, “evidence of neglect by a parent prior to

losing custody of a child—including an adjudication of such neglect—is admissible in

subsequent proceedings to terminate parental rights[,]” but “[t]he trial court must

also consider any evidence of changed conditions in light of the evidence of prior

neglect and the probability of a repetition of neglect.” In re Ballard, 311 N.C. 708, 715

(1984). After weighing this evidence, the court may find the neglect ground if it
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 concludes the evidence demonstrates “a likelihood of future neglect by the parent.” In

 re R.L.D., 375 N.C. 838, 841 (2020). Thus, even in the absence of current neglect, the

 trial court may adjudicate neglect as a ground for termination based upon its

 consideration of any evidence of past neglect and its determination that there is a

 likelihood of future neglect if the child is returned to the parent. Id. at 841, n.3. In

 doing so, the trial court must consider evidence of changed circumstances that may

 have occurred between the period of prior neglect and the time of the termination

 hearing. In re Z.V.A., 373 N.C. 207, 212 (2019) (citing Ballard, 311 N.C. at 715).

¶ 19 Here, the juveniles were adjudicated neglected on 7 November 2018. The trial

 court also found as fact in its termination order that DSS received a report regarding

 respondent-mother and the juveniles, and during their first interview with

 respondent-mother “[s]he admitted to intravenous drug use, methamphetamine use,

 and domestic violence between she and [Mr. Scott]. She also admitted that [Mr. Scott]

 attempted to choke her in bed on one occasion.” The trial court further found as fact

 that respondent-mother was given the opportunity to work toward reunification with

 the juveniles through compliance with a DSS case plan, but that she failed to comply.

 The trial court made the following findings of fact concerning respondent-mother’s

 compliance with her case plan and concerning its determination that there would be

 a repetition of neglect should the juveniles be returned to respondent-mother’s care:

 24. At the time of the [May 16, 2019 permanency planning]
 hearing, the respondent mother had still not secured
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

independent housing; had missed scheduled visitations
with the juveniles five times from September 2018 until the
court date; was using alcohol; had been charged with
Driving While Impaired (DWI) in May of 2019 with a blood
alcohol concentration of 0.15, eight (8) months after the
children came into the care of the Petitioner’s custody; was
placed on probation for Felony Breaking and Entering
stemming from an incident in December of 2018; had not
completed substance abuse treatment but was engaged
with intensive outpatient substance abuse treatment
(“IOP”) and was providing negative urine drug screens to
her provider; and had not gotten her domestic violence
assessment, but completed domestic violence coursework
on November 15, 2018. She had also completed the
Children in the Middle parenting class on November 1,
2018. The respondent mother was unable to complete the
Seeking Safety course due to a lack of funding to pay for
the class.

25. By March 29, 2019, [respondent-mother] completed
over 100 hours of IOP. She subsequently relapsed and was
charged with her DWI offense in May of 2019. She then
completed 36 hours of intermediate substance abuse
treatment as recommended aftercare, ending on August 19,
2019. The respondent mother provided negative urine drug
screens through the substance abuse provider.

....

27. The respondent mother was on felony probation with a
6 to 17-month suspended sentence at the time she was
charged with her pending DWI and was ordered not to
consume alcohol as a probationary condition. She now has
a pending felony probation violation as a result. The
respondent mother was also engaged in substance abuse
treatment for nine hours per week through RHA at the
time of her DWI offense. The respondent mother testified
that she does not currently have a driver’s license and she
anticipated she will lose her license once convicted of the
DWI. Per the testimony of the respondent mother’s
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

probation officer, except for the violation relating to her
pending DWI and possession of alcohol, the respondent
mother is otherwise fully compliant and has provided
consistent negative urine drug screens.

28. Since coming into the Petitioner’s custody on
September 7, 2018, the juvenile [Holden] has made
disclosures of a long pattern of alcohol and substance abuse
by the respondent mother as well as patterns of domestic
violence in his presence between the respondent mother
and her multiple romantic partners throughout his
childhood. In addition to the initial disclosures regarding
[Mr. Scott], [Holden] has described observing the
respondent mother and [Bella’s putative father, R.M.]
getting drunk and fighting all the time, the respondent
mother breaking a bottle over [R.M.’s] head, [R.M.] beating
[Holden] with a belt with spikes, and receiving a beating
from [R.M.] during an argument about eating beans that
was so bad that [Holden] can no longer eat beans. The
respondent mother acknowledged that [R.M.] did beat
[Holden] because of beans and testified that this incident
triggered her to leave [R.M.].

29. Both juveniles have been admitted for inpatient
psychiatric treatment at Copestone since coming into the
Petitioner’s custody, in part as a result of behaviors
exhibited in reaction to the respondent mother and the
situations she has exposed them to.

30. The respondent mother . . . came to Copestone in April
2019 when [Bella] was being assessed for admission. While
at the hospital, a social worker from [DSS] smelled alcohol
on the respondent mother and requested that she submit
to a breathalyzer. The respondent mother agreed, then
stated she was going to the restroom and left the premises
without submitting to a breathalyzer and without waiting
to see if [Bella] was going to be admitted. The following
day, she acknowledged to [a] social work supervisor [ ] that
she had been drinking.

31. The respondent mother [ ] has admitted to employees
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

of the Petitioner that she replaced methamphetamine with
alcohol after [DSS] took custody of the juveniles.

32. [Bella] was diagnosed with Static Encephalopathy,
alcohol exposed, following testing by the Olsen Huff
Center, which was caused by the respondent mother
consuming alcohol while pregnant with [Bella]. The
diagnosis indicates that [Bella] has suffered irreversible
brain damage and will have life-long effects due to her
exposure to substances while in utero.

33. [Holden] has been increasingly struggling with
negative behaviors since coming into the custody of the
Petitioner on September 6, 2018. He has had
uncontrollable fits of crying and yelling; has run away from
placement providers and had to be returned by law
enforcement; and has had to be transported to a children’s
crisis center and a psychiatric inpatient unit due to his
behaviors.

....

35. [Holden] has increasingly resisted visiting with the
respondent mother. He initially claimed sickness on his
visitation days with the respondent mother and missed
multiple visits from July until September 2019. At his last
visit with the respondent mother in September 2019, he
became extremely upset and engaged in self-harming
behaviors including beating his head into the wall until he
had to be taken outside and the visit ceased. He has
directly stated to the respondent mother that he never
wants to live with her and he blames her for the things she
has put him through.

36. With the consent of all parties, the [c]ourt interviewed
[Holden] in chambers . . . . [Holden] stated and the [c]ourt
finds that [Holden] does not want to return to the custody
of the respondent mother due to the experiences she has
put him through.

37. [Bella] participates in therapy . . . weekly. The therapist
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 does not support returning [Bella] to the care of respondent
 mother [ ] due to the behaviors exhibited by the juvenile
 and the unreliable environment provided by the
 respondent mother.

 38. While the [c]ourt acknowledges that the respondent
 mother has made some progress on her case plan tasks,
 much of this progress occurred subsequent to the filing of
 the Petitions to terminate her parental rights in these
 causes. The respondent mother completed her domestic
 violence education classes prior to having an assessment of
 her level of need, and she has not completed additional
 classes after her assessment despite the assessment
 stating she is at high risk.

 39. While the [c]ourt recognizes the respondent mother’s
 recent participation in substance abuse treatment, her
 long-standing history of substance abuse and domestic
 violence with multiple partners in the presence of the
 children, her delayed participation in any meaningful
 treatment, her prior relapse while participating in similar
 services, the traumatic effects and impact on the children
 from her behaviors, and the diagnoses, behaviors, and
 wishes of the children all demonstrate the juveniles’
 continued neglect and the strong likelihood of neglect if
 returned to the respondent mother’s custody.

 To the extent these findings of fact are not challenged by respondent-mother, they

 are binding on appeal. See In re T.N.H., 372 N.C. at 407.

¶ 20 Although respondent-mother does not argue that finding of fact 31 is

 unsupported by clear, cogent, and convincing evidence, she nonetheless contends the

 trial court’s “concerns” about her substitution of alcohol for her prior drug use are

 unsupported. A review of the record shows that there is a factual basis for the trial

 court’s concerns.
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

¶ 21 The record is replete with instances of respondent-mother’s abuse of alcohol,

 both in the short-term and long-term. The trial court found that when Bella was being

 considered for admission to Copestone in April 2019, respondent-mother arrived

 smelling of alcohol, and despite agreeing to take a breathalyzer test, she left without

 taking one. Additionally, respondent-mother was arrested for DWI in May 2019,

 which also constituted a violation of the term of her probation requiring that she

 abstain from alcohol use. Holden also disclosed that respondent-mother had “a long

 pattern” of alcohol abuse. Furthermore, the trial court found that respondent-

 mother’s history of alcohol abuse had a direct and deleterious impact on Bella. Bella

 was diagnosed with static encephalopathy, alcohol exposed, and suffered irreversible

 brain damage due to respondent-mother consuming alcohol while she was pregnant

 with Bella. Thus, the trial court could reasonably infer that respondent-mother had

 merely replaced her abuse of drugs with alcohol abuse. See In re D.L.W., 368 N.C.

 835, 843 (2016) (stating that it is the trial court’s duty to consider all the evidence,

 pass upon the credibility of the witnesses, and determine the reasonable inferences

 to be drawn therefrom).

¶ 22 Respondent-mother additionally argues that the trial court relied solely on

 past circumstances and mistakenly discounted evidence of progress occurring after

 the filing of the petition to terminate her parental rights. Respondent-mother asserts

 that while she did not complete all aspects of her case plan, at the time of the
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 termination hearing she had made sufficient progress towards being able to care for

 Holden and Bella.

¶ 23 It is apparent from the trial court’s findings of fact that when determining

 whether there would be a likelihood of future neglect, the trial court placed heavy

 emphasis on incidents occurring prior to the filing of the petition to terminate

 respondent-mother’s parental rights in June 2019. However, despite respondent-

 mother’s arguments to the contrary, the trial court also specifically stated that it

 considered respondent-mother’s “recent participation in substance abuse treatment”

 when determining that there likely would be a repetition of neglect. The trial court

 ultimately determined, however, that respondent-mother’s last-minute progress was

 insufficient to outweigh her long-standing history of alcohol and substance abuse and

 domestic violence, as well as the impact these behaviors had on Holden and Bella. In

 these circumstances, we conclude that it was not error for the trial court to find that

 there likely would be a repetition of neglect in the future should Holden and Bella be

 returned to respondent-mother’s care. See In re O.W.D.A., 375 N.C. 645, 653–54

 (2020) (stating that “evidence of changed conditions must be considered in light of the

 history of neglect by the parents and the probability of a repetition of neglect,” and

 although a respondent may have made some recent, minimal progress, “the trial court

 was within its authority to weigh the evidence and determine that these eleventh-

 hour efforts did not outweigh the evidence of his persistent failures to make
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 improvements . . . and to conclude that there was a probability of repetition of

 neglect[.]”). Accordingly, we hold that grounds existed pursuant to N.C.G.S. § 7B-

 1111(a)(1) to terminate respondent-mother’s parental rights.

¶ 24 We next consider respondent-mother’s argument that the trial court erred by

 finding that it was in Holden’s and Bella’s best interests to terminate her parental

 rights. If the trial court finds grounds to terminate parental rights under N.C.G.S.

 § 7B-1111(a), it proceeds to the dispositional stage where it must “determine whether

 terminating the parent’s rights is in the juvenile’s best interest” based on the

 following factors:

 (1) The age of the juvenile.

 (2) The likelihood of adoption of the juvenile.

 (3) Whether the termination of parental rights will aid in
 the accomplishment of the permanent plan for the
 juvenile.

 (4) The bond between the juvenile and the parent.

 (5) The quality of the relationship between the juvenile and
 the proposed adoptive parent, guardian, custodian, or
 other permanent placement.

 (6) Any relevant consideration.

 N.C.G.S. § 7B-1110(a) (2019).

¶ 25 Here, the trial court made separate findings of fact addressing each juvenile’s

 date of birth and then made the following findings concerning the factors set forth in

 N.C.G.S. § 7B-1110(a):
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 54. The juveniles’ permanent plan has been designated [as]
 adoption, and there is a strong likelihood of adoption due
 to the age of the juveniles. Termination of the [respondent-
 mother’s] parental rights would assist the Petitioner in
 achieving permanency for the juveniles and would
 eliminate this barrier to implementing the juveniles’
 permanent plan.

 55. [Bella] has a bond with the Respondent Mother. [Bella]
 enjoys her visits with the Respondent Mother.

 56. [Holden] is not bonded to the Respondent Mother and
 continues to actively resist having any contact with her,
 with his last visit occurring [in] July 2019.

 57. The minor children were placed in a new foster home
 together on August 13, 2019. They remained in the same
 foster home until October 18, 2019, when [Holden] was
 removed to a separate home due to his behaviors. They now
 reside in separate foster homes, neither of which are pre-
 adoptive placements.

 58. [DSS] is actively attempting to locate a new foster home
 for both children that will adopt them together, but no such
 home has been identified as of yet.

 59. [Bella] was involuntarily committed into the Copestone
 mental health unit of Mission Hospital in April 2019, due
 to her behavior.

 60. [Holden] was involuntarily committed into the
 Copestone mental health unit of Mission Hospital on July
 26, 2019, due to his behavior. His hospitalization lasted for
 two weeks.

We review the trial court’s dispositional findings of fact to determine whether they

are supported by competent evidence. In re K.N.K., 374 N.C. 50, 57 (2020).

Dispositional findings not challenged by respondent-mother are “binding on appeal.”
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 In re Z.L.W., 372 N.C. 432, 437 (2019).

¶ 26 Respondent-mother contends that while the trial court “nominally” addressed

 the statutory factors set forth in N.C.G.S. § 7B-1110, the findings were “pro forma”

 and did not address the substance of the statutory requirements. Respondent-mother

 asserts that consideration of Holden’s and Bella’s best interests weigh strongly

 against termination of her parental rights. Respondent-mother cites the strong bond

 that she had with Bella, the trial court’s failure to consider whether Holden would

 consent to adoption, and the fact that neither juvenile was in a pre-adoptive

 placement. Respondent-mother cites In re J.A.O., 166 N.C. App. 222, 227 (2004) to

 support her contention that the trial court should not have terminated her parental

 rights because Holden and Bella were not adoptable.

¶ 27 However, in this case, the trial court’s findings of fact were not merely “pro

 forma.” The trial court did not simply recite the statutory factors but considered them

 along with the facts of this case. For example, the trial court noted that Holden did

 not have a bond with respondent-mother and “actively resists having any contact with

 her.” The trial court also found that Bella did have a bond with respondent-mother

 and enjoyed her visits with her. Furthermore, while the trial court found that there

 was a strong likelihood of adoption and termination would aid in achieving

 permanency, the trial court also recognized that the juveniles were not in pre-

 adoptive placements and were residing in separate foster homes, while noting that
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 DSS was attempting to locate a new foster home that would adopt both juveniles

 together. Thus, respondent-mother’s contention that the trial court only nominally

 addressed the statutory factors set forth in N.C.G.S. § 7B-1110 is without merit.

¶ 28 Second, although respondent-mother does not challenge the trial court’s

 finding of fact 54 that there was a strong likelihood of adoption as being unsupported

 by the evidence, she nonetheless argues that adoption would be difficult, noting the

 juveniles’ multiple disrupted foster placements, the fact that no pre-adoptive home

 has been identified, and the fact that both juveniles had been involuntarily committed

 for being a danger to themselves and others. Respondent-mother also contends that

 the trial court failed to consider whether Holden would consent to adoption. See

 N.C.G.S. § 48-3-601(1) (2019) (providing that a minor over the age of twelve must

 consent to adoption unless consent is not required under N.C.G.S. § 48-3-603).

 However, even if we agreed with respondent-mother’s contentions regarding the

 adoptability of the juveniles, this factor alone is not dispositive. We have stated that

 “the trial court need not find a likelihood of adoption in order to terminate parental

 rights.” In re C.B., 375 N.C. 556, 562 (2020); see also In re A.R.A., 373 N.C. 190, 200

 (2019) (“[T]he absence of an adoptive placement for a juvenile at the time of the

 termination hearing is not a bar to terminating parental rights.” (alteration in

 original) (quoting In re D.H., 232 N.C. App. 217, 223 (2014))).

¶ 29 Furthermore, In re J.A.O., cited by respondent-mother, is readily
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 distinguishable from the instant case. In In re J.A.O., the juvenile had “a history of

 being verbally and physically aggressive and threatening, and he ha[d] been

 diagnosed with bipolar disorder, attention deficit hyperactivity disorder, pervasive

 developmental disorder, borderline intellectual functioning, non-insulin dependent

 diabetes mellitus, and hypertension.” In re J.A.O. 166 N.C. App. at 228. The juvenile

 had “been placed in foster care since the age of eighteen months and ha[d] been

 shuffled through nineteen treatment centers over the last fourteen years.” Id. at 227.

 As a result, the guardian ad litem argued at trial that the juvenile was unlikely to be

 a candidate for adoption and that termination was not in the juvenile’s best interests

 because it would “cut him off from any family that he might have.” Id. at 228. Despite

 this evidence, and despite finding that there was only a “small ‘possibility’ ” that the

 juvenile would be adopted, the trial court concluded that it was in the juvenile’s best

 interests to terminate the mother’s parental rights. Id. On appeal, the Court of

 Appeals reversed. The Court of Appeals balanced the minimal possibilities of

 adoption “against the stabilizing influence, and the sense of identity, that some

 continuing legal relationship with natural relatives may ultimately bring” and

 determined that rendering J.A.O. a legal orphan was not in his best interests. Id.

¶ 30 Here, the juveniles have only been in foster care for thirteen months, as

 opposed to the many years that J.A.O. spent being “shuffled” through various

 treatment centers. Id. at 227. Additionally, while the guardian ad litem in J.A.O.
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 argued that the juvenile was unlikely to be adopted and termination was not in his

 best interests, the guardian ad litem here stated in its report that “there is potential

 for both children to be successfully adopted” and advocated for termination to achieve

 permanence for Holden and Bella. A social worker likewise testified that she had

 “every hope . . . that [Holden and Bella] can be adopted together.” Furthermore, while

 Bella did have physiological issues and both juveniles had behavioral issues that

 required their involuntary commitment, there is no indication that their issues were

 as serious as those experienced by the juvenile in J.A.O. Id. at 228. We note that a

 social worker testified that Holden had been moved to a new foster home and “is doing

 great and [has] no behavior problems. He loves it there and he gets along great with

 the foster dad.” Moreover, as noted previously, Bella’s physiological issues and both

 juveniles’ behavioral issues can be directly attributable to respondent-mother.

 Consequently, respondent-mother’s argument concerning the likelihood of the

 juveniles’ adoption and the significance of that consideration in the best interests’

 determination is unavailing.

¶ 31 Third, respondent-mother does not challenge the trial court’s dispositional

 finding that Holden was not bonded to her as being unsupported by the evidence.

 Respondent-mother instead argues that a “more accurate finding would be that he

 was angry with his mother. If he wasn’t bonded, he wouldn’t have been angry – he

 wouldn’t have cared.” However, a social worker testified that Holden “blames his
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 mom for everything that he’s already been through and that he hates her and doesn’t

 want to live with her.” Based on this evidence, the trial court could reasonably infer

 that Holden had no bond with respondent-mother. See In re D.L.W., 368 N.C. at 843

 (stating that it is the trial judge’s duty to consider all the evidence, pass upon the

 credibility of the witnesses, and determine the reasonable inferences to be drawn

 therefrom).

¶ 32 Additionally, while respondent-mother may have maintained a bond with

 Bella, this Court has repeatedly recognized that “the bond between parent and child

 is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial

 court is permitted to give greater weight to other factors.” In re Z.L.W., 372 N.C. at

 437. This Court concluded in In re Z.L.W. that, based on the trial court’s consideration

 of the other statutory factors and given the respondent’s lack of progress on his case

 plan, “the trial court’s determination that other factors outweighed [the] respondent’s

 strong bond with [the juveniles] was not manifestly unsupported by reason.” Id. at

 438.

¶ 33 Similarly, here, it was not an abuse of discretion for the trial court to determine

 that other factors outweighed respondent-mother’s bond with Bella. There was

 evidence to show that Bella is likely to be adopted, and that termination of

 respondent-mother’s parental rights was necessary to achieve permanence.

 Accordingly, we conclude that the trial court properly considered the statutory factors
 IN RE H.A.J. AND B.N.J.

 2021-NCSC-26

 Opinion of the Court

 set forth in N.C.G.S. § 7B-1110(a) and did not abuse its discretion by determining

 that termination of respondent-mother’s parental rights was in the best interests of

 the juveniles.

 IV. Conclusion

¶ 34 The trial court did not err by failing to grant respondent-mother a continuance

 of the 16 May 2019 permanency planning review hearing and the trial court made

 sufficient findings of fact when eliminating reunification from the juveniles’

 permanent plan. Furthermore, the trial court properly concluded that grounds

 existed to terminate respondent-mother’s parental rights pursuant to N.C.G.S. § 7B-

 1111(a)(1). Finally, the trial court did not abuse its discretion by determining that

 termination of respondent-mother’s parental rights was in the best interests of the

 juveniles. Accordingly, we affirm the trial court’s orders.

 AFFIRMED.